UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MARC A. LANDSBERG, M.D.,               )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )               08-CV-59-B-W
                                        )
MAINE COAST REGIONAL HEALTH            )
FACILITIES d/b/a MAINE COAST            )
MEMORIAL HOSPITAL, and                  )
                                        )
RENATA MOISE, C.N.M.,                   )
                                        )
            Defendants.                 )

**RECOMMENDED DECISION ON
MOTION FOR SUMMARY JUDGMENT**

Dr. Marc A. Landsberg was three weeks into a *locum tenens* assignment with Maine

Coast Memorial Hospital in Ellsworth when allegations of inappropriate touching were raised by

Renata Moise, a certified nurse midwife with whom he worked.  Maine Coast investigated the

allegations by speaking with the women involved and concluded that no actionable conduct had

occurred, but that Dr. Landsberg's relationship with some staffers had gotten off on such a poor

footing that it was not worth continuing with his *locum tenens* assignment.  In this civil action

Dr. Landsberg, now a resident of Pennsylvania, is suing Maine Coast and Nurse Midwife Moise

for defamation and tortious interference with an advantageous business relationship.  The action

is before the Court based on the parties' diverse state citizenship.  The Defendants filed a motion

for summary judgment and the Court referred the motion to me for report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B).  Based on my review of the summary judgment record and

the arguments presented by the parties, I conclude that the claim of tortious interference should not go forward, but that genuine issues of fact necessitate a trial on the defamation claim.

### FACTS

The following facts are drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

Defendant Maine Coast operates a hospital located in Ellsworth, Maine.  At all times relevant to this lawsuit, Maine Coast's chief operating officer has been Douglas Jones and its vice president of physician services has been Dana Fadley.  Maine Coast operates Maine Coast Women Care, which provides obstetrics and gynecology (OB/GYN) services as well as midwife services to patients.   At all times relevant to this lawsuit, Carol Ray was the office manager of Maine Coast Women Care.   (Defs.' Statement of Material Facts (DSMF) ¶¶ 1-5, Doc.[1] 29.)

In December 2006, Maine Coast needed OB/GYN coverage after losing a member of its permanent medical staff to suicide.   (Id. ¶ 6.)  Maine Coast filled the vacancy through CompHealth, a *locum tenens* physician's staffing firm, which is in the business of engaging physicians as independent contractors to provide *locum tenens* physician services to its clients. (Id. ¶ 9.)  The *locum tenens* physicians are employees of neither CompHealth nor the client to whom they are assigned.  (Id. ¶ 10.)  There is no direct contractual relationship between the

---

[1]     Docket entry.

CompHealth client and the *locum tenens* physician.  (Id. ¶ 11.)  The client relationship between Maine Coast and CompHealth is governed by a written contract.  (Id. ¶ 13.)  Pursuant to that contract, Maine Coast was not obligated to maintain a *locum tenens* assignment for any particular period of time and could cancel an assignment for any reason with thirty days written notice, or sooner subject to a penalty of up to thirty days worth of physician coverage fees.   (Id. ¶ 14.)  Maine Coast's point of contact with CompHealth was Brian Peterson.  (Id. ¶ 15.)

Dr. Marc A. Landsberg is a licensed medical physician, residing in Philadelphia, Pennsylvania, with a practice concentrated in the field of obstetrics and gynecology.  Dr. Landsberg contracted with CompHealth to furnish *locum tenens* physician services to CompHealth clients.  The provider relationship between Dr. Landsberg and CompHealth was governed by a written contract.  This contract authorized CompHealth to immediately cancel any assignment "without notice or liability" for a number of reasons, including "Client's request for removal of Physician for reasons relating to professional competence or integrity."  Dr. Landsberg began a *locum tenens* assignment at Maine Coast, through CompHealth, on or about March 7, 2007.  Maine Coast was not a party to the contract between Dr. Landsberg and CompHealth.  Nor was Dr. Landsberg a party to the contract between Maine Coast and CompHealth.  (Id. ¶¶ 16-23.)

Dr. Landsberg testified at his deposition that his first week at Maine Coast went well and that he got along well with the office staff, the nurses, and the administration.  (Id. ¶ 26.)  During this initial week, Dr. Landsberg and Mr. Fadley discussed the possibility that Dr. Landsberg might fill the full-time OB/GYN position if things worked out.  (Id. ¶¶ 27-29.)

By his third week at Maine Coast there were some ripples in the waters.  Some staffers thought Dr. Landsberg was boisterous and that he wore too much cologne.   Some were offended

3

that he jokingly offered patients a free "tummy-tuck" with their c-sections.  In addition, Mr.

Foley counseled Dr. Landsberg after he took a call on his cell phone during an exam.  (Id. ¶¶ 37-

43, 45, 97.)

For her part, Defendant Renata Moise, a certified nurse midwife with Maine Coast, found

Dr. Landsberg to be demanding.  (Id. ¶ 44.)  On March 21, 2007, she wrote a letter to Mr. Fadley

stating that she did "not feel that Dr. Landsberg is the right fit to be our permanent OBGYN."

(Id. ¶ 46.)  Moise did not want Landsberg to obtain a permanent position and her concern that he

might was causing her to lose sleep at night.  (Pl.'s Additional Statement (PAS) ¶¶ 2-3, Doc. 48.)

According to Nurse Midwife Moise, the day after she wrote her letter she was visited by a staffer

named Michelle Dorr.  Ms. Dorr came into Moise's office, closed the door, and said, referring to

Dr. Landsberg, "[t]hat man is just too close and I can't stand it."  Ms. Dorr then demonstrated

how Dr. Landsberg had "straddled" her (with his arms) while she was seated at her desk, leaning

over her to look at her computer screen.[2]  (DSMF ¶ 47.)

Later that day Moise met in consultation with Dr. Landsberg regarding a patient.  She

reported to Maine Coast Women Care's office manager, Ms. Ray, that Dr. Landsberg had

touched her inappropriately during that consultation.  She also drafted a letter to Maine Coast's

human resources department, stating that Dr. Landsberg had touched her inappropriately.  Moise

gave the letter to Ms. Ray, who placed it in the inter-office outbox and left for vacation.  That

night, Moise talked about the incident with her husband and showed him the letter she had

written to the human resources department.  (Id. ¶¶ 48-53.)  Because Moise was scheduled to be

on call that weekend and Dr. Landsberg would be her backup, she called another doctor, Dr.

---

[2]        Dr. Landsberg objects on hearsay grounds to Moise's account of what Ms. Dorr said.  I conclude that it is
not offered for the truth of the matter, only to explain Moise's subsequent actions.

4

Maloney, and persuaded him to be available as her back up, if needed, after telling him that Dr. Landsberg touched her in an inappropriate manner.  (Id. ¶ 55-56.)

The next day, Moise telephoned members of Maine Coast's human resources department and reported the incident.  (Id. ¶ 60.)  She told at least three staffers that she felt Landsberg had touched her in an inappropriate fashion.  (PAS ¶ 6.)  She also hand delivered a second letter to the human resources department, in which she clarified that she was lodging a sexual harassment complaint against Dr. Landsberg, elaborated on how he had touched her, refused to work further with him, and urged that he be removed from the hospital.  (DSMF ¶ 61.)

On Saturday, March 24, 2007, Moise sent an email from her home computer to Dr. Simmons, the director of the Medical Professionals' Health Program, a peer review committee of the Maine Medical Association that offers non-disciplinary, voluntary assistance to medical professionals whose health problems may compromise their professional and personal lives and the lives of their patients.  Moise wrote that she had heard through the grapevine that Dr. Landsberg had difficulty obtaining a Maine license, but that she did not know why.  Moise had no idea if this was true.  She reported that she had observed Dr. Landsberg squeezing the high shoulder/low neck area of one of the office nurses and squeezing the arms of others, briefly, like one would squeeze fruit.  She also wrote that, during her consultation with Dr. Landsberg:

> I laid out the lab work on the counter in front of me and asked if I could consult
> with him about the patient.  His stance in the center of the secretarial area made it
> possible for him to observe that all three staff members in close proximity were
> turned away and busy.  When I asked to consult with him and began to explain
> the case, he stepped to his right, toward me and my side of the file cabinet console
> that sits in the middle of the secretarial area, he being on my left, and quickly
> reached around behind me with his right arm, grasping me with a squeezing
> motion at the juncture of my neck and shoulder, pulling me toward him, making
> his body be in close contact with mine, all the while looking down at the lab slips
> I had laid down on the top of the cabinet.

5

She volunteered that nobody except her husband had touched her that way in 16 years and argued, in closing:

> Touching another person's body without their permission in a professional setting, especially a women's medical facility, is unethical beyond question.  In a medical facility whose mission is the health and well being of women's bodies, to have a strange man grab a woman, or touch a woman outside of a medical situation, is unthinkable.

(DSMF ¶¶ 31-33, 63; PAS ¶¶ 15-17, 23.)  She also reported what Ms. Dorr had told her and relayed the particulars of whom she had spoken with subsequent to the incident and what they had told her.  (DSMF ¶ 64.)  It is undisputed that Dr. Simmons never received the email.  (Id. ¶ 66;  Stipulated Facts ¶¶ 1-3, Doc. 41.)

On Monday, March 26, 2007, Moise electronically submitted a complaint against Dr. Landsberg to the Maine Board of Licensure in Medicine ("the Board").   Her complaint mostly repeated what she wrote to Dr. Simmons, but she added:  "This man is dangerous to women and should not be practicing as an OBGYN.  The only excuse for this sexual assault would be that he has a brain tumor which is disinhibiting him."  (Id. ¶¶ 70-72.)  With regard to her "brain tumor" comment, Moise was just "throwing out ideas."  (Pl.'s Opposition Statement ¶ 73, Doc. 48.)  She had spent some time doing research online to diagnose what might cause such a lack of inhibition in a person.  (PAS ¶ 9.)  Moise attached to her complaint a copy of her email to Dr. Simmons.  (Id. ¶ 13.)

Moise's accusations eventually reached Douglas Jones and Lois Macias, Maine Coast's risk manager.  Mr. Jones instructed Mr. Fadley to investigate the complaint and Mr. Fadley reported back that he had confirmed the information.  (DSMF ¶¶ 57, 74-76.)  Dr. Landsberg learned of Moise's complaint on Monday, March 26, 2007, when he received a phone call at his hotel room from Mr. Fadley.  Dr. Landsberg dressed and went to Mr. Fadley's office, where the

6

two of them discussed the matter for about 10 or 15 minutes.  Dr. Landsberg was very upset at what he was being accused of and denied Moise's accusations, vowing that he "should drop dead on this spot right now if this incident ever took place."  (Id. ¶¶ 77-80.)

Later that day, when Mr. Fadley asked Maine Coast Women Care's staff about the incident, the staffers said that they had not witnessed it, but that there were other instances where they perceived that Dr. Landsberg had invaded people's personal space.  Fadley reported back to Mr. Jones that he had confirmed the things that were in Nurse Midwife Moise's letter and found the information credible.  (Id. ¶¶ 81-84.)

Mr. Jones and Mr. Fadley consulted with legal counsel and decided to cancel Dr. Landsberg's *locum tenens* assignment.  The decision to cancel the assignment was not made on the basis of Nurse Midwife Moise's e-mail to Dr. Simmons, which Mr. Jones had not seen at that point.  When Mr. Fadley saw Dr. Landsberg again that day, he told him he would not be able to continue working there with such accusations being made.  (Id. ¶¶ 85-88.)

On March 27, Moise authored a letter to Mr. Fadley.  In the letter she speculated[3] that Dr. Landsberg was suffering from some sort of "brain damage problem" or "sexually aggressive behavior problem"; that he may have a "narcissistic character"; that he engaged in "bizarre behavior"; that there might be "dysfunction of the frontal lobes of the brain as a possible cause of disinhibition"; or that there may be alcohol-related dementia.  (PAS ¶¶ 27-32.)  She explained in her letter:  "I guess I am looking for a reason."  (Defs.' Reply Statement (DRS) ¶¶ 27-28, 30- 31.)

Dr. Landsberg asserts that Moise also defamed him in a complaint she filed with the Pennsylvania Board of Licensure.  (PAS ¶ 26.)  In addition, Dr. Landsberg asserts that Moise

---

[3]     The term "speculated" was chosen by Dr. Landsberg, not Maine Coast.

published her accusations to her massage therapist.  (Id. ¶¶ 35-36.)  The Defendants may or may not seek to assert a privilege with respect to this evidence on the ground that the therapist in question also provides Moise with psychotherapy services.  (DRS ¶¶ 35-36.)

When Maine Coast canceled Dr. Landsberg's assignment, CompHealth placed an administrative hold on the doctor, during which CompHealth would not offer his services to clients.  (DSMF ¶ 90.)  Dr. Landsberg demanded to be paid thirty days worth of additional wages.  (Id. ¶ 94.)  Many communications between Maine Coast and CompHealth concerned the reasons for the cancelled assignment, its impact on the parties' contractual rights, and who should pay what to whom.  (Id. ¶ 95.)

Dr. Landsberg and CompHealth did not want Maine Coast to terminate Dr. Landsberg's medical staff privileges because of the credentialing difficulties this would cause.  On April 9, 2007, Mr. Fadley explained to Mr. Peterson that Maine Coast was still working with its legal department on how to handle the matter, but that it was not revoking Dr. Landsberg's medical privileges, and Mr. Peterson told Mr. Fadley that Dr. Landsberg was pursuing legal action, but "if [Maine Coast] would pay his one month's pay and night call, he would settle."  (Id. ¶¶ 98-99.)

Meanwhile, the Board sent Mr. Jones a letter, reminding him that "in accordance with [24 M.R.S.A.] § 2506, you must provide me within sixty (60) days pertinent information relating to the actions taken, including a detailed description of the event or events giving rise to the action."  (Id. ¶ 100.)  Mr. Jones explained the situation to the Board in the following terms:

> As a result of the complaint by Nurse Midwife Moise, we have conducted an investigation and found two prior instances where the doctor had "invaded personal space" but concluded that in both of these instances no action was called for.  However, both of these instances fueled a sense within the office that created a high level of anxiety after Nurse Midwife Moise's experience.

8

In our opinion had this been a situation that involved a well known practitioner it could in all likelihood have been handled satisfactorily with an administrative warning following an appropriate verbal exchange between the two individuals. However, because this physician was not well known to the staff they reacted strongly and with a high level of discomfort.

We concluded that with the relatively low level of investment that we have in this physician the most prudent course was to work with another locum tenens practitioner. Had the circumstances involved a physician employed by the hospital our action would have been different but, in either case, we did not envision any action to restrict medical staff privileges.

(Id. ¶ 101.)

In a letter dated April 17, 2007, Mr. Fadley wrote to Mr. Peterson of CompHealth the

following:

Maine Coast Memorial Hospital decided to terminate the Locum Tenens Agreement on Mar[c] Alan Landsberg, M.D. (who was providing coverage for our Woman Care Practice) on Monday, March 26, 2007.

I received a complaint from one of our staff members at our Woman Care practice regarding what they felt was inappropriate contact by Dr. Landsberg. I spoke to the other staff members at the practice and no one specifically observed this incident but did feel he displayed behavior which made them feel uncomfortable.

Maine Coast determined that it would not be prudent to continue having Dr. Landsberg working at our Woman Care Practice. We appreciate your efforts to help us meet our OB/GYN needs but do not feel our organization could continue to employ[] Dr. Landsberg.

(Id. ¶ 103.) Mr. Fadley's statement to Mr. Peterson that he "received a complaint from one of our

staff members at our Woman Care practice regarding what they felt was inappropriate contact by

Dr. Landsberg" is true. (Id. ¶ 104.)

On April 24, 2007, Mr. Fadley told a representative of CompHealth that because the

hospital "felt it was a he said she said accusation they were not reporting [Dr. Landsberg] to any

professional board," but that Nurse Midwife Moise "acted outside of the hospital and did send a

letter to the . . . Board." (Id. ¶ 108.)  On April 24, 2007, a representative of CompHealth spoke with a representative of the Board and learned that the Board had not yet processed Nurse Midwife Moise's complaint against Dr. Landsberg and that the doctor's license to practice medicine in Maine was in good standing.  (Id. ¶ 109.)  CompHealth removed its administrative hold on Dr. Landsberg on April 24, 2007, after learning more about the reasons why Maine Coast had cancelled the assignment.  (Id. ¶ 110.)

In May 2007, the Board informed Dr. Landsberg that it had considered information gathered from Nurse Midwife Moise and Maine Coast and that it had voted on its own motion to issue a complaint against him for unprofessional conduct.  The Board provided Dr. Landsberg with the materials it had considered, including statements made and information provided by Nurse Midwife Moise and Maine Coast.  Dr. Landsberg forwarded to CompHealth all of the materials he had received from the Board, which included statements made and information provided by the Defendants to the Board.  (Id. ¶¶ 111-113.)  CompHealth placed a second administrative hold on Dr. Landsberg when the Board issued a complaint against him.  (Id. ¶ 115.)

In June 2007, Dr. Landsberg sent the Board his response to the complaint, denying that he had violated any standard of professional conduct and opining that Nurse Midwife Moise was "vindictive" and "unstable."  Later in July the Board notified Dr. Landsberg that the complaint against him was dismissed.  Upon receipt of the Board's letter, dated July 12, 2007, CompHealth removed the second administrative hold placed on Dr. Landsberg.  By the time CompHealth lifted its second administrative hold, it was willing to keep working with Dr. Landsberg, but he was working in a *locum tenens* assignment with a competing firm that ultimately resulted in a permanent position.  (Id. ¶¶ 116-120, 125.)

10

The Defendants admit that, at all times relevant to the allegations of Dr. Landsberg's complaint, Renata Moise was acting within the course and scope of her employment with Maine Coast.  (PAS ¶ 1.)  The Defendants do not attempt to establish at the summary judgment stage that Nurse Midwife Moise's statements related to physical contact between Dr. Landsberg and the staff are true.  (Defs.' Mot. at nn. 3, 4 & 5, Doc. 28.)

## DISCUSSION

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

The Complaint recites two Maine law tort claims:  defamation and tortious interference with an advantageous economic relationship.  Both are challenged in the pending motion.  I address them in order.

11

A.       **Defamation**

The elements of defamation are (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.  Cole v. Chandler, 2000 ME 104, ¶ 5, 752 A.2d 1189, 1193.

The Defendants' Motion for Summary Judgment attempts to pare certain statements that are neither defamatory nor statements of fact.  The Defendants raise privilege defenses and maintain that there was no fault on par with negligence under these circumstances.  In the Defendants' view, Maine Coast is entitled to summary judgment on the entire defamation claim because its appointed spokespersons (Jones and Fadley) went out of their way not to defame Dr. Landsberg, and Nurse Midwife Moise is entitled to a judgment that limits her exposure to a narrow set of statements.  (Defs.' Mot. at 9-24.)  As for Maine Coast, the Defendants argue that anything published by way of Mr. Jones or Mr. Fadley was plainly stated in the context of their effort to respond to allegations and reports by staff members without making any factual assertions of their own concerning any allegedly inappropriate conduct.  They say that, consequently, all of these statements explaining the situation to third parties (CompHealth and the Board) are true, because the staffers really did make these allegations, and are non-defamatory, because it was made clear that Maine Coast chose to discontinue the relationship with Dr. Landsberg for administrative expediency, rather than based on a finding of any actual wrongdoing.  (Id. at 11-12.)

In response, Dr. Landsberg states that he does not base his lawsuit on statements made by either Mr. Jones or Mr. Fadley, only on statements made by Nurse Midwife Moise.  However, he

attributes Moise's statements to Maine Coast based on a *respondeat superior* theory of liability. (Pl.'s Opposition at 7, Doc. 47.)  Maine Coast does not respond to the *respondeat superior* stance in its reply.  Instead, it merely reiterates that the statements officially authored by Maine Coast (through Jones and Fadley) cannot support the defamation claim.  (Defs.' Reply, Doc. 52.)  The parties are at least agreed upon that.

As for *respondeat superior*, it is a correct statement of Maine law that an employer can be liable for defamatory statements made by an employee in the course of employment, including statements published by one employee to another.  Gavrilovic v. Worldwide Language Res., Inc., 441 F. Supp. 2d 163, 168, 184 (D. Me. 2006) (imposing vicarious liability on employer for defamatory statements made by supervisor concerning a supervisee);  Rippett v. Bemis, 672 A.2d 82, 85, 88-89 (Me. 1996) (recognizing a claim of defamation against a sheriff based on defamatory statements made by a detective whom the sheriff specifically assigned to conduct an investigation and directly ordered to participate in a televised interview to publish his conclusions);  Staples v. Bangor Hydro-Electric Co., 629 A.2d 601, 603-604 (1993) (affirming defamation award against employer based on defamatory statements by supervisor about fired supervisee);  Heselton v. Wilder, 496 A.2d 1063 (1985) (involving defamation claim by terminated employee against employer (and others) based on co-worker's accusation of theft, which was accepted by employer as ground for termination, but making no mention of *respondeat superior* or vicarious liability);  Restatement (Second) of Torts § 577 cmt. i (concerning communication within the scope of employment).  Maine Coast fails to offer any argument why this rule would not keep it in the fray under the circumstances of this case.

Indeed, it admits without qualification Dr. Landsberg's assertion that Nurse Midwife Moise was at all times relevant acting within the scope of her employment.[4]   (DRS ¶ 1, admitting PAS ¶ 1.)

Moving beyond *respondeat superior*, the Defendants observe that Dr. Landsberg cannot expand his defamation claim beyond the statements identified in his complaint.  They note that the complaint was never amended and that the only defamatory statements positively identified in the complaint are the following eight:

a.    That Plaintiff Landsberg touched Defendant Moise's body in an inappropriate manner and without permission;

b.    That [he] inappropriately behaved around other female employees of the Hospital;

c.    That [he] had engaged in sexual harassment;

d.    That [he] was "dangerous to women and should not be practicing as an OB/GYN";

e.    That [he] committed "sexual assault";

f.    That [he] was suffering from "a brain tumor which is disinhibiting him";

g.    That [he] engaged in "inappropriate contact" with staff of the Hospital;

h.    That [he] "displayed behavior" which made staff "uncomfortable."

(Compl. ¶ 13, Doc. 1.)  The Defendants ask the Court to pare any additional statements belatedly raised at the summary judgment stage, such as Moise's "grapevine" comment about Dr. Landsberg having difficulty obtaining a Maine License and any statements she may have made in her complaint to the Board of Licensure in Pennsylvania.  (Defs.' Reply at 3-4.)  I include in the list statements advanced in the Plaintiff's Additional Statement of Material Facts related to

---

[4]    Given the factual record presented to the Court, in particular the Defendants' admission that Moise was at all relevant times acting within the scope of her employment, there is no summary judgment factual controversy concerning the application of the *respondeat superior* doctrine.  I make this observation only to clarify that I am not recommending that the Court conclude, as a matter of law, that the doctrine of *respondeat superior* necessarily applies.

Nurse Midwife Moise's final letter to Mr. Fadley, where she suggests some sort of "brain damage problem," "sexually aggressive behavior problem," "narcissistic character," "dysfunction of the frontal lobes of the brain," and/or alcohol-related dementia in her effort to identify a reason to explain Dr. Landsberg's alleged disinhibition and "bizarre behavior."  (DRS ¶¶ 27-28, 30- 31; see also Pl.'s Opposition at 9-10.)

The Court should grant the request related to the grapevine statement and the statements Moise made in her letter to Mr. Fadley because they were not previously identified and were never incorporated into an amended pleading.[5]  Veilleux v. NBC, 8 F. Supp. 2d 33, 34-35 (D. Me. 1998).  It is not so clear that the rule should be applied to prevent Dr. Landsberg from basing his case in part on republication of previously identified statements to newly identified third parties, like the Pennsylvania Board of Licensure.  Presumably, the fact that Nurse Midwife Moise made these statements to the Pennsylvania Board would make them admissible, in any event, to demonstrate the extent of Moise's effort to tan Dr. Landsberg.  Also, the fact that Moise voiced her grievance to the Pennsylvania Board does not move the summary judgment analysis forward because Dr. Landsberg has not asserted that any of the statements contained in that communication went beyond what he has alleged in paragraph 13 of his Complaint.  Consequently, the operative statements remain the same.  For present purposes, the grapevine statement and the speculative statements in the letter to Mr. Fadley are not material to the question of liability, as a matter of law, because they have not been properly incorporated into the pleadings.  I next consider whether any of the remaining statements are not actionable, either because they amounted to expressions of opinion or because they were privileged.

---

[5]     The effort to diagnose Dr. Landsberg's alleged condition would be non-actionable opinion, in any event. Even Dr. Landsberg describes these comments as speculation in his statement of additional facts.

 1.      *A dangerous propensity caused by a brain tumor?*

A defamatory statement is a false statement of fact that has a tendency to lower the

community's estimation of the person who is the subject of the statement.  Ballard v. Wagner,

2005 ME 86, ¶ 10, 877 A.2d 1083, 1087.  "A false statement must be 'an assertion of fact, either

explicit or implied, and not merely an opinion, provided the opinion does not imply the

existence of undisclosed defamatory facts.'"  Id. (quoting Lester v. Powers, 596 A.2d 65, 69 (Me.

1991)).  The pure expression of opinion is not actionable.  Id.  To divine the line between fact

and opinion the Court must "look to the totality of the circumstances and to whether the

statement was intended to state an objective fact or a personal observation."  Id., 2005 ME 86, ¶

11, 877 A.2d at 1087-88.

The Defendants argue that the editorial content Moise added in her letter to the Board of

Licensure falls into the opinion category and cannot be regarded as defamatory.  The following

statement is at issue:  "This man is dangerous to women and should not be practicing as an

OBGYN.  The only excuse for this sexual assault would be that he has a brain tumor which is

disinhibiting him."  The Defendants say this is a form of argumentative hyperbole and would not

reasonably be read as disclosing any additional defamatory facts, citing Levinsky's, Inc. v. Wal-

Mart Stores, 127 F.3dd 122, 126-128 (1997).  I agree with the Defendants that the brain tumor

comment is only reasonably read as an expression of conjecture or opinion, not as an assertion of

fact.  However, Moise's assessment of Dr. Landsberg as dangerous to women is more in the

nature of an opinion that implies the existence of undisclosed defamatory facts because it tends

to cast Moise's factual assertions about inappropriate physical contact in a much darker light.

There is touching that is merely inappropriate and then there is touching that is intimidating and

abusive.  This comment paints the picture in darker tones.  Opinion or not, reporting that a man

16

is dangerous to women "presents or implies the existence of facts which are capable of being proven true or false." Id. at 127. This makes the statements actionable. Id.

      2.     *Privileged publication?*

The Defendants argue that Maine Coast's report to the Board of Licensure about the termination of Dr. Landsberg is absolutely privileged under sections 2506 and 2511 of the Professional Competence Reports subchapter of the Maine Health Security Act, 24 M.R.S. §§ 2501-2511. Section 2506 requires a health care provider to report in writing to the Board when it has terminated the employment of a practitioner, including a description of the events giving rise to the adverse employment action. Id. § 2506. An entity required to file a report under the subchapter is "immune from civil liability" for making a report or providing other information to the Board pursuant to legal requirements. Id. § 2511(1).

There is a question whether the immunity conferred by the Act is qualified or absolute when applied to a health care provider making a report, as compared to a "person" making a report. This question arises as a result of the placement of an adverbial phrase and what might be a case of subject-verb disagreement:

> Any person acting without malice, any physician, podiatrist, health care provider, health care entity or professional society, any member of a professional competence committee or professional review committee, any board or appropriate authority and any entity required to report under this chapter are immune from civil liability . . .
> [f]or making any report or other information available to any board . . . .

Id. The placement of the "without malice" phrase and the use of the plural verb "are," suggest that "any person acting without malice" is the first of several independent categories so that the malice exception to immunity applies only to any person not otherwise described in the list. In any event, even if the malice qualification applies to Maine Coast, as far as Maine Coast is

concerned, the record is not capable of supporting a factual finding that the statements made by Mr. Fadley or Mr. Jones were in any way motivated by malice.  McCullough v. Visiting Nurse Serv., 1997 ME 55, ¶ 14, 691 A.2d 1201, 1205.  Moreover, the question is academic when applied to these particular statements because Dr. Landsberg has conceded that his defamation claim is not based on any statements authored by Mr. Fadley or Mr. Jones.

Because Nurse Midwife Moise falls into the "any person" category, she will lose immunity in connection with her reports only if she abused the privilege by acting with "malice." In the defamation context, a defendant who has made defamatory statements knowing they are false is regarded as having acted with malice.[6]  Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc., 504 F.3d 189, 204 (1st Cir. 2007) (applying Maine law and distinguishing "malice" for purposes of a conditional privilege from "malice" required to support an award of punitive damages);  Lester, 596 A.2d at 69 n.7 (same).  For purposes of summary judgment, there is a genuine issue whether Moise abused the privilege afforded to her under the Maine Health Security Act with respect to her report to the Board.  This conclusion respecting abuse also extends to the common law conditional privilege that attaches to her statements within the workplace.  Gavrilovic, 441 F. Supp. 2d at 183 ("Maine has recognized a conditional privilege for statements within an employment relationship.");  Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1996) ("A conditional privilege may arise in any situation in which an important interest of the recipient of a defamatory statement will be advanced by frank communication.");  Lester v. Powers, 596 A.2d 65, 69 (Me. 1991) ("A conditional privilege against liability for defamation arises in settings where society has an interest in promoting free, but not absolutely unfettered

---

[6]      I assume that this is the meaning of malice intended by the Legislature when it passed the immunity provision of the Health Security Act.

18

speech."); Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me. 1989) ("It is also clear, however, that [the defendant] enjoyed a conditional privilege in his work as a Colby College employee."). The common law conditional privilege is abused where a statement is made with malicious intent, such as when made with knowledge that it is false. Gautschi, 565 A.2d at 1011. Moise's communication with her husband, however, is absolutely privileged. Restatement (Second) of Torts § 592 (1977).

I conclude that the question of privilege must be submitted to the Jury because the Defendants concede that there is a genuine issue of fact whether Dr. Landsberg ever engaged in any inappropriate touching. Should the Jury believe his testimony that he did not engage in any such conduct, it might also find that Nurse Midwife Moise's contrary assertions were made with knowledge that they were false.

       *3.*     *Fault amounting at least to negligence?*

The third element of the tort of defamation requires proof of "fault amounting at least to negligence on the part of the publisher." Cole, 2000 ME 104, ¶ 5, 752 A.2d at 1193. The Defendants argue that Maine Coast escapes liability on this element as well because "Maine Coast did not take a position on whether Dr. Landsberg had actually touched Nurse Midwife Moise in the manner she had alleged or had actually invaded other staffers' personal space to an extent where 'action was called for.'" (Defs.' Mot. at 22.) Dr. Landsberg has already decided that he will not base his defamation claim on any of the reports authored by Maine Coast, choosing to focus on Moise's statements to persons affiliated with the practice and attributing the statements to Maine Coast by operation of the *respondeat superior* doctrine. Because there remains a genuine question whether Moise spoke falsely, a finding of fault is possible on this record.

19

4.      *Presumed damages and punitive damages*

The Defendants argue that this case does not fall into the category of cases in which

defamatory statements are actionable regardless of proof of special harm.  (Defs.' Mot. at 23.)

As a matter of Maine common law, this is plainly incorrect.  Statements concerning a person's

fitness for his profession are *per se* damaging to reputation.  <u>Staples</u>, 561 A.2d at 501-502

(vacating entry of summary judgment, including entry against punitive damages, where the

plaintiff "testified that his superiors falsely accused him of erasing computer files" because the

accusation "relates to his profession" and therefore "could be actionable despite the absence of

any special damages").  However, the Defendants request a finding that Moise was speaking on a

matter of public interest because prospective patients would want to know whether an OB/GYN

had a penchant for touching women inappropriately in the office.  (Defs.' Mot. at 23.)  They

maintain that First Amendment law encroaches on the common law defamation claim because

Dr. Landsberg serves patients who are members of the public, and also because Moise's reports

to the licensure boards amounted to petitions "for redress of grievances."  (<u>Id.</u>)  The objective of

this attack is to force Dr. Landsberg to prove his actual injury and to remove punitive damages

from the picture.

In <u>Gertz v. Robert Welch, Inc.</u>, the Supreme Court extended First Amendment law to a

state defamation claim arising from a magazine report respecting a private citizen, but it did so

only with regard to the availability of presumed or punitive damages when the publication

concerns a matter of public interest.   418 U.S. 323, 348-49 (1974).  To allow presumed or

punitive damages for defamatory speech concerning a matter of public interest, the Court held

that state common law must require proof of a known falsehood or reckless disregard for the

truth.[7]  Id. at 349.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  Connick v. Myers, 461 U.S. 138, 147-48 (1983).  Moise's effort to "constitutionalize" her employee grievance is like the similar, unsuccessful effort in Connick, 461 U.S. at 154, which I will not expound upon here.  Moise's speech concerning Dr. Landsberg was inherently addressed toward her private interest in who might obtain a permanent position as the OB/GYN for Maine Coast Women Care.  For example, the record does not support a finding that Moise ever attempted to inform the public of her professed concern for patient safety.  See id. at 148 (observing that the plaintiff "did not seek to inform the public" of her concerns related to her public employer's alleged failure to discharge public duties or other alleged wrongdoing).  The Court should reject the Defendants' effort to bring the First Amendment into this case.

        *5.     Compelled self-defamation*

Lest there be one tantalizing area of defamation law left untouched, there is an issue of "compelled self-defamation" in this case.   The Defendants observe that the only publication of allegedly defamatory content to CompHealth came from Dr. Landsberg himself, since the statements published by Maine Coast to CompHealth were not defamatory and the statements made by Nurse Midwife Moise were not directed to CompHealth.  They argue that Dr. Landsberg may not base his defamation claim on his voluntary decision to publish the content of Moise's accusations to CompHealth.  (Defs.' Mot. at 16.)  Dr. Landsberg responds that "it was entirely foreseeable to [the Defendants] that if these types of incendiary accusations were directed at Dr. Landsberg, then he would be expected to go to CompHealth . . . to provide further

---

[7]       Even if this standard were applied here, summary judgment would not be warranted because the Defendants have conceded that a genuine issue exists on the truth/falsehood question.

context and explanation as to why his *locum tenens* assignment was terminated." (Pl.'s
Opposition at 14.)

"Compelled self-publication" occurs when the defamed person is forced into a position of
publishing a defamatory statement about himself or herself. See Gomes v. Univ. of Me. Sys.,
365 F. Supp. 2d 6, 46 (D. Me. 2005); Carey v. Mount Desert Island Hosp., 910 F. Supp. 7, 11-
12 (D. Me. 1995). This Court has assumed that the Maine Supreme Judicial Court would
recognize the rule in an appropriate case. Smith v. Heritage Salmon, 180 F. Supp. 2d 208, 222
(D. Me. 2002); Carey, 910 F. Supp. at 11 & n.1. The compelled self-publication rule has been
varyingly described as arising in circumstances that "negate" voluntariness, or where the person
defamed "must republish defamatory statements" or is otherwise "strongly compelled" to
republish defamatory statements. Carey, 910 F. Supp. at 12 & nn. 3, 5. Consideration is given
to whether the publisher of a defamatory statement would reasonably foresee that the person
defamed would be placed in a predicament where he would be compelled to republish
defamatory statements. Id. at 11 n.1 (citing Cormier v. B.P. Oil, Inc., No. 86-CV-224-B (D. Me.
1988) (unpublished recommended decision by Keith, M. J., affirmed by Carter, C. J.)). For
example, "a 'strong compulsion' may exist when a job seeker must tell a prospective employer
the reasons he was terminated in order to explain away a negative job reference from his former
employer." Lin v. Circuit City, No. 95-56031, 1996 U.S. App. Lexis 33694, *11, 1996 WL
744359, *3 (9th Cir. Dec. 27, 1996). It is a fact question whether self-publication arose from
compelling circumstances as opposed to voluntary action. Id.; Carey, 910 F. Supp. at 12 n.3.

The record reflects that CompHealth lifted its administrative hold on Dr. Landsberg on
April 24, 2007, after hearing Maine Coast's reasons for terminating the *locum tenens* assignment,
without ever requiring Dr. Landsberg to disclose or repeat any of the underlying accusations

leveled by Nurse Midwife Moise.  In effect, CompHealth was satisfied with the contextual

explanation Maine Coast had provided to that date, *i.e.*, that it was a he said/she said situation

that did not warrant revocation of any medical privileges or referral to any professional board.

Subsequently, because Nurse Midwife Moise unilaterally filed a report with the Board, causing

the Board to initiate an administrative investigation, CompHealth placed a second administrative

hold on Dr. Landsberg, evidently as a matter of policy.  It was at this point that Dr. Landsberg

disclosed the contents of Moise's complaint to CompHealth.  I conclude that these facts could

support a finding that Nurse Midwife Moise's publication of allegedly defamatory statements to

the Board "compelled" Dr. Landsberg to republish those statements to CompHealth, with whom

he might pursue alternative employment.  This completes the discussion of the legal issues

pertaining to the defamation claim.

**B.      Tortious Interference**

        In the second count of the complaint, Dr. Landsberg alleges that the Defendants

tortiously interfered with his CompHealth contract.  (Compl. ¶ 22.)  Tortious interference with an

advantageous business relationship "requires the existence of a valid contract or prospective

economic advantage, interference with that contract or advantage through fraud or intimidation,

and damages proximately caused by the interference."  Barnes v. Zappia, 658 A.2d 1086, 1090

(Me. 1995).  Interference by fraud requires the following additional proof:

> (1) making a false representation (2) of a material fact (3) with knowledge of its
> falsity or in reckless disregard of whether it is true or false (4) for the purpose of
> inducing another to act or refrain from acting in reliance on it, and (5) the other
> person justifiably relies on the representation as true and acts upon it to the
> damage of the plaintiff.

Grover v. Minette-Mills, Inc., 638 A.2d 712, 716 (Me. 1994).  Interference by intimidation

requires proof of unlawful coercion or extortion.  Rutland v. Mullen, 2002 ME 98, ¶ 16, 798

A.2d 1104, 1111.  The Defendants challenge this claim on various grounds, depending on how

the claim is characterized.  In particular, Maine Coast argues that it cannot be found to have

"interfered" with the *locum tenens* assignment to Maine Coast Women Care because it was a

party to that business relationship rather than an intermeddler.  (Defs.' Mot. at 24-25.)  In his

opposition brief, Dr. Landsberg asserts that "the contract at issue here is the contract between Dr.

Landsberg and CompHealth" rather than the contract between Maine Coast and CompHealth.

(Pl.'s Opposition at 19.)  Dr. Landsberg's contention is that the Defendants tortiously interfered

with his economic relationship with CompHealth because their actions caused CompHealth to

place an administrative hold on him so that his CV was not presented for alternative work.  (Id.

at 21 & n. 4.)

I conclude that the summary judgment record is not adequate to support a finding that an

act of "intimidation" was ever directed toward CompHealth.  I also conclude that the record

cannot support a finding that CompHealth ever relied on any allegedly false statement by Nurse

Midwife Moise.  Reliance is an essential element of interference by fraud.  Grover, 638 A.2d at

716.  Even assuming that Nurse Midwife Moise's accusations were false, there is no evidence

that CompHealth relied on any of Moise's statements as true, which precludes a finding that it

was materially misled or defrauded by Moise.  In this case there simply is no indication that

CompHealth ever concluded that Dr. Landsberg had engaged in conduct justifying discharge for

cause or any other form of sanction based on Moise's accusations.  Rather, the record reflects that

it placed an administrative hold on Dr. Landsberg based exclusively on the fact that the Board

decided to conduct its own investigation, without ever having been misled about the actual

circumstances.[8] Cf. Springer v. Seaman, 658 F. Supp. 1502, 1508-1509 (D. Me. 1987)

(reflecting how an intervening investigation can preclude a finding of reliance).

### CONCLUSION

Based on the foregoing discussion, I RECOMMEND that the Court GRANT IN PART

the Defendants' Motion for Summary Judgment and enter judgment for the Defendants on count

II of the Complaint.  As for count I, the summary judgment record developed by the parties does

not foreclose the possibility that all of the defendants might be found liable for defamation based

on certain statements made by Nurse Midwife Moise.  The summary judgment proceedings have,

however, narrowed the field of actionable statements to those published by Moise to Maine

Coast personnel, to third parties other than her husband, and to CompHealth by way of Dr.

Landsberg's allegedly compelled re-publication of the same.  Although these proceedings

foreclose an imposition of liability on Maine Coast for statements authored by its administrators,

for purposes of summary judgment Maine Coast has effectively conceded that Moise at all

relevant times was acting within the scope of her employment.  (DRS ¶ 1, admitting PAS ¶ 1.)


### NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within ten (10) days of being served with a copy
thereof.  A responsive memorandum and any request for oral argument before the
district judge shall be filed within ten (10) days after the filing of the objection.

---

[8]     Dr. Landsberg does not allege in his Complaint or pursue at the summary judgment stage a claim that
Nurse Midwife Moise is independently liable to him for interfering with his advantageous relationship with Maine
Coast.

   Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

           /s/ Margaret J. Kravchuk
           U.S. Magistrate Judge

April 10, 2009