UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MARC A. LANDSBERG, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CV-08-59-B-W |
| | ) |
| MAINE COAST REGIONAL HEALTH | ) |
| FACILITIES d/b/a MAINE COAST | ) |
| MEMORIAL HOSPITAL, and | ) |
| RENATA MOISE, C.N.M., | ) |
| | ) |
| Defendants. | ) |

**ORDER ADOPTING IN PART AND REJECTING IN PART
THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE**

Marc A. Landsberg, M.D., filed suit against Defendants Maine Coast Memorial Hospital (MCMH) and Renata Moise, a Certified Nurse Midwife, seeking compensatory and punitive damages for defamation and tortious interference with an advantageous business relationship. MCMH and C.N.M. Moise moved for partial summary judgment. On April 10, 2009, the United States Magistrate Judge filed with the Court her recommended decision on Defendants' motion. *Recommended Decision on Motion for Summary Judgment* (Docket # 54) (*Rec. Dec.*). The Magistrate Judge recommended that the Court grant Defendants' motion in part and enter judgment in their favor on the tortious interference claim, but allow the defamation claim to go to trial. Dr. Landsberg objects; Defendants do not. *Pl. Marc A. Landsberg, M.D.'s Objection to Magistrate's Rec. Dec. on Mot. for Summ. J.* (Docket # 55) (*Pl.'s Obj.*); *Defs.' Resp. to Pl.'s Objection to Magistrate's Rec. Dec. on Summ. J.* (Docket # 56) (*Defs.' Resp.*). The Court has conducted a *de novo* review of the Magistrate Judge's recommendation and determines that summary judgment on the tortious interference claim is inappropriate.

I.     STATEMENT OF FACTS

Located in Ellsworth, Maine, MCMH operates Maine Coast Women Care, which provides obstetrical and gynecological (OB/GYN) services as well as midwife services to patients.  *Defs.' Statement of Material Facts* ¶¶ 1, 4 (Docket # 29) (*Defs.' SMF*); *Pl.'s Opposing Statement of Material Facts* ¶¶ 1, 4 (Docket # 48) (*Pl.'s Opposing SMF*).  The staff at MCMH includes C.N.M. Moise.  *Defs.' SMF* ¶ 7; *Pl.'s Opposing SMF* ¶ 7.  In December 2006, MCMH needed OB/GYN services, because an OB/GYN physician who had been on the staff had recently died, and MCMH was in the process of recruiting a permanent replacement.  *Defs.' SMF* ¶¶ 6, 8; *Pl.'s Opposing SMF* ¶¶ 6, 8.  While doing so, it turned to CompHealth, a locum tenens physician staffing firm, which engages physicians as independent contractors to provide locum tenens physician services to its clients.[1]  *Defs.' SMF* ¶¶ 9, 12; *Pl.'s Opposing SMF* ¶¶ 9, 12.  Locum tenens physicians are not employed by CompHealth or by the client, in this case MCMH.  *Defs.' SMF* ¶ 10; *Pl.'s Opposing SMF* ¶ 10.

Marc A. Landsberg, M.D., is a licensed physician, specializing in OB/GYN; he resides in Philadelphia, Pennsylvania.  *Defs.' SMF* ¶ 16; *Pl.'s Opposing SMF* ¶ 16.  Dr. Landsberg contracted with CompHealth to furnish locum tenens services to CompHealth clients and pursuant to CompHealth's contractual relationship with MCMH and his contractual relationship with CompHealth, Dr. Landsberg began a locum tenens assignment at MCMH on March 7, 2007.  *Defs.' SMF* ¶¶ 13, 17, 18, 21; *Pl.'s Opposing SMF* ¶¶ 13, 17, 18, 21.

On Thursday, March 22, 2007, C.N.M. Moise sent a letter to MCMH's human resources department alleging that Dr. Landsberg had touched her inappropriately that same day.  *Defs.' SMF* ¶¶ 50-52; *Pl.'s Opposing SMF* ¶¶ 50-52.  She repeated this allegation to others in person,

---

[1] "Locum tenens," a term derived from Medieval Latin, literally "one holding an office," refers to a person holding an office for a time or temporarily taking the place of another.  It is most commonly used to refer to clergy or physicians.  *Webster's Third New International Dictionary* 1329 (2002).

2

over the telephone, in writing, and by email. Those who heard this allegation directly from C.N.M. Moise before Saturday, March 24, include (1) her husband; (2) Carol Ray, MCMH Women Care's Office Manager; (3) Dr. Sean Maloney; (4) Tina Buteau; (5) Michelle Dorr; and, (6) various members of MCMH's human resources department. *Defs.' SMF* ¶¶ 49, 53, 56, 60; *Pl.'s Opposing SMF* ¶¶ 49, 53, 56, 60; *Pl.'s Statement of Additional Material Facts* ¶ 6 (Docket # 48) (*Pl.'s SAMF*); *Defs.' Reply Statement of Material Facts* ¶ 6 (Docket # 53) (*Defs.' Reply SMF*). On Friday, C.N.M. Moise sent a follow-up letter to the human resources department and on Saturday, she sent an extensive email to Dr. David J. Simmons, the Director of the Medical Professionals' Health Program, a peer review committee of the Maine Medical Association.[2] *Defs.' SMF* ¶¶ 32, 62-63; *Pl.'s Opposing SMF* ¶¶ 32, 62-63. Early Monday morning, she submitted a complaint to the Maine Board of Licensure in Medicine (the Board) against Dr. Landsberg, consisting largely of the Simmons email. *Defs.' SMF* ¶¶ 71-72; *Pl.'s Opposing SMF* ¶¶ 71-72. Around this time, C.N.M. Moise also filed a complaint with the Board of Licensure in Medicine in Pennsylvania, where Dr. Landsberg resides. *Defs.' SMF* ¶ 16; *Pl.'s Opposing SMF* ¶16; *Pl.'s SAMF* ¶ 26; *Defs.' Reply SMF* ¶ 26.

On Sunday, Dana Fadley, MCMH's vice president of physician services, became aware of the allegation and spoke with C.N.M. Moise about it. *Defs.' SMF* ¶ 70; *Pl.'s Opposing SMF* ¶ 70. Promptly on Monday morning, Mr. Fadley brought a copy of one of C.N.M. Moise's letters to the human resources department to Douglas Jones, MCMH's chief operating officer. *Defs.' SMF* ¶ 74; *Pl.'s Opposing SMF* ¶ 74. At Mr. Jones's direction, Mr. Fadley immediately "confirmed the information," "found the information credible," and met with Dr. Landsberg to discuss the matter. *Defs.' SMF* ¶¶ 74-84; *Pl.'s Opposing SMF* ¶¶ 74-84.

---

[2] The parties stipulated that Dr. Simmons never received this email, which was sent to an inactive or at least unchecked email address. *Stip. Facts* ¶¶ 2, 3 (Docket # 41).

After consulting with counsel, Mr. Jones and Mr. Fadley decided to cancel Dr. Landsberg's assignment. *Defs.' SMF* ¶ 85; *Pl.'s Opposing SMF* ¶ 85. Dr. Landsberg told Trish Reinhardt, CompHealth staff consultant/physician representative, that he had been accused of inappropriate touching and that he had denied the allegation. *Defs.' SMF* ¶ 89; *Pl.'s Opposing SMF* ¶ 89. Mr. Fadley told Brian Peterson, MCMH's client representative at CompHealth, about the Moise allegation, and added that there were two other complaints that Dr. Landsberg made people feel uncomfortable, is too "touchy feely," and "invades their personal space." *Defs.' SMF* ¶ 91; *Pl.'s Opposing SMF* ¶ 91; *Peterson Dep. Ex. 2* at 2 (Docket # 30-2).

Upon learning that MCMH had cancelled Dr. Landsberg's assignment because of C.N.M. Moise's allegation, CompHealth placed him on administrative hold, and did not offer his services to its clients. *Defs.' SMF* ¶ 90; *Pl.'s Opposing SMF* ¶ 90. MCMH never revoked Dr. Landsberg's medical privileges, however, and after CompHealth received on April 17, 2007 a written explanation from MCMH and learned that Dr. Landsberg's license to practice medicine in Maine was in good standing, CompHealth removed the administrative hold on April 24, 2007. *Defs.' SMF* ¶¶ 99, 103-04, 109-10; *Pl.'s Opposing SMF* ¶¶ 99, 103-04, 109-10.

The hold was not released for long. About a month later, in late May, CompHealth imposed a second hold when the Board issued a complaint against Dr. Landsberg "alleging unprofessional conduct based on allegations that [he] inappropriately touched a certified nurse midwife and sexual boundary issues with other employees." *Defs.' SMF* ¶¶ 111, 115; *Pl.'s Opposing SMF* ¶¶ 111, 115; *Aff. of L. Dennis Carrillo*, Attach. 1 (Docket # 29-3). By the time the Board dismissed the complaint in July and CompHealth released the second hold as a result, Dr. Landsberg had begun working with another staffing firm and had acquired another assignment. *Defs.' SMF* ¶¶ 119-20; *Pl.'s Opposing SMF* ¶¶ 119-20.

4

## II. THE MOTION FOR SUMMARY JUDGMENT

Dr. Landsberg's Complaint contains two counts against each Defendant: Count I, defamation, and Count II, tortious interference with an advantageous economic relationship. *Compl.* (Docket # 1). On January 12, 2009, Defendants moved for partial summary judgment on Count I, saying that some of C.N.M. Moise's statements were neither false nor defamatory, that none of MCMH's statements was, that the allegedly defamatory statements had not been published to a third party, that the statements were privileged, that the evidence did not sustain a claim of fault amounting to at least negligence, and that Dr. Landsberg cannot recover presumed or punitive damages. *Defs.' Mot. for Partial Summ. J.* at 9-24 (Docket # 28) (*Defs.' Mot.*). They also moved for summary judgment on Count II on the ground that neither C.N.M. Moise nor MCMH interfered with Dr. Landsberg's contract with CompHealth through fraud or intimidation. *Id.* at 25-30.

## III. THE RECOMMENDED DECISION

The Magistrate Judge recommended that the defamation claim should go forward, but concluded that the record does not support a finding that either Defendant interfered by fraud or intimidation with Dr. Landsberg's contractual relationship with CompHealth. *Rec. Dec.* at 2, 23-25. With respect to interference by fraud, the Magistrate Judge concluded there is nothing in the record indicating that CompHealth ever relied on any of C.N.M. Moise's allegedly false statements. *Id.* at 23-24 (citing *Grover v. Minette-Mills, Inc.*, 638 A.2d 712, 716 (Me. 1994)). With respect to interference by intimidation, the Magistrate Judge similarly concluded that the record is devoid of evidence that either MCMH or C.N.M. Moise interfered in an unlawfully coercive or extortionate manner with Dr. Landsberg's contractual relationship with CompHealth. *Id.* (citing *Rutland v. Mullen*, 2002 ME 98, ¶ 16, 798 A.2d 1104, 1111). Dr. Landsberg objected

to the Recommended Decision; the Defendants did not. Accordingly, the Court addresses solely the tortious interference claim.[3]

## IV. DR. LANDSBERG'S OBJECTION AND DEFENDANTS' RESPONSE

Dr. Landsberg first takes aim at the Magistrate Judge's conclusion regarding reliance. He begins (somewhat obliquely) by contending it is immaterial who within MCMH made the allegedly false representation to CompHealth because under Maine law, so long as the speaker was acting within the scope of employment, MCMH is vicariously liable for the representation. *Pl.'s Obj.* at 3 (citing *Forum Fin. Group v. President & Fellows of Harvard Coll.*, 173 F. Supp. 2d 72, 98 (D. Me. 2001)). This may be generally true,[4] but it does not generate a genuine issue of fact as to whether either Defendant is liable for tortious interference. Confronting liability more directly, Dr. Landsberg contends it is reasonable to infer that CompHealth relied on C.N.M. Moise's accusations when it imposed the administrative holds. *Id.* at 5. He also claims "a jury *could* infer that CompHealth's decision to place Dr. Landsberg on hold was motivated by fear that CompHealth would lose its contract with [MCMH] if Dr. Landsberg continued to receive assignments." *Id.* at 7 (emphasis in original).

Defendants disagree that it is reasonable to infer CompHealth relied on C.N.M. Moise's allegations in placing its administrative holds on Dr. Landsberg. They contend that the first hold was imposed "simply because" MCMH had cancelled Dr. Landsberg's assignment. *Defs.' Resp.* at 3. They also imply that CompHealth could not have relied on C.N.M. Moise's allegations

---

[3] In addition to recommending that the Defendants' motion for summary judgment on the defamation count be denied, the Magistrate Judge recommended that the Court pare the defamation claim by excluding from the list of allegedly defamatory statements the so-called grapevine statement and statements C.N.M. Moise made in her letter to Mr. Fadley. *Rec. Dec.* at 15. As neither Dr. Landsberg nor the Defendants objected to this portion of the Recommended Decision, the Court adopts and affirms the Recommendation Decision on the defamation claim. The Court does not view the recommendation as ruling on the admissibility of these statements, but only whether they are actionable.

[4] *But see Grover*, 638 A.2d at 717 (finding an employer vicariously liable for its employees' commission of tortious interference by fraud where the employees' commission of the tort was "aided by their employment relationship" with the employer (citing *McLain v. Training & Dev. Corp.*, 572 A.2d 494, 497-98 (Me. 1990))).

when it imposed the first hold because it did not receive either MCMH's explanation letter or a copy of the complaint C.N.M. Moise submitted to the Board until after it imposed the first hold. *Id.* at 3-4. Further, Defendants suggest that any finding of reliance is undermined by the fact that CompHealth removed the first hold when MCMH explained that the entire matter was "a he said she said accusation." *Id.* Finally, Defendants argue that the record is insufficient to support any inference of intimidation. *Id.* at 5-6.

## V. DISCUSSION

The Law Court recently described the intentional tort of interference with an advantageous relationship as requiring "'the existence of a valid contract or prospective economic advantage, interference with that contract or advantage through fraud or intimidation, and damages proximately caused by the interference.'" *Sherbert v. Remmel*, 2006 ME 116, n.3, 908 A.2d 622, 623 (quoting *Petit v. Key Bank of Me.*, 688 A.2d 427, 430 (Me. 1996)). Where the plaintiff alleges that the defendant interfered by fraud, the plaintiff must establish the elements of fraud:

> "A person is liable for fraud if the person (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff."

*Id.* (quoting *Grover*, 638 A.2d at 716). On the other hand, a plaintiff alleging interference by intimidation must show "unlawful coercion or extortion." *Rutland*, 2002 ME 98, ¶ 16, 798 A.2d at 1111. Under either approach, "a plaintiff must establish fraud or intimidation by a preponderance of the evidence." *McGeechan v. Sherwood*, 2000 ME 188, n.17, 760 A.2d 1068, 1081.

### A. Contract or Prospective Economic Advantage

7

In Count II of his Complaint and in his opposition to Defendants' summary judgment motion, Dr. Landsberg makes clear that he is alleging Defendants interfered with his contract with CompHealth, not with a more nebulous prospective economic advantage in connection with his locum tenens assignment at MCMH. *Compl.* ¶¶ 21-24; *Pl. Marc A Landsberg, M.D.'s Opp'n to Defs.' Mot. for Partial Summ. J.* at 19 (Docket # 47) (reiterating that "the contract at issue here is the contract between Dr. Landsberg and CompHealth"). Defendants admit that Dr. Landsberg's contract with CompHealth was valid and in effect when CompHealth imposed both administrative holds. *Pl.'s SAMF* ¶ 38; *Defs.' Reply SMF* ¶ 38.

### B.    Intimidation

Dr. Landsberg first objects to the Magistrate Judge's conclusion that the record does not support a finding of unlawful coercion or extortion. Dr. Landsberg notes that intimidation in Maine is "'not restricted to frightening a person for coercive purposes,'" and he says that *Currie v. Industrial Security, Inc.*, 2007 ME 12, 915 A.2d 400, is "analogous to the case at bar." *Pl.'s Obj.* at 5 (quoting *Pombriant v. Blue Cross/Blue Shield of Me.*, 562 A.2d 656, 659 (Me. 1989)). In *Currie*, Irving Forest Products, Inc. (IFP) had contracted with Industrial Security, Inc. (ISI) to provide security for its lumber mill in Ashland, Maine, and Mr. Currie worked for ISI providing security for the mill. *Currie*, 2007 ME 12, ¶ 2, 917 A.2d at 402. Mr. Currie claimed that Alain Ouellette, an IFP manager, improperly pressured ISI to fire him, and that after a number of months, ISI did so, buckling to IFP's pressure. *Id.* ¶ 30, 917 A.2d at 408. Currie claimed that Mr. Ouellette had intimated ISI by making it clear that if ISI discharged Currie, its contract with IFP would not be terminated. *Id.* There was no direct evidence of IFP pressure on ISI, but the Law Court observed that "[t]his arrangement need not be overtly expressed to be 'made clear' to [ISI]." *Id.* ¶ 33, 917 A.2d at 408. The Law Court concluded that "[b]ased on the material facts .

. . and despite the absence of direct evidence of intimidation, a jury *could* infer that [ISI] fired Currie out of fear that ISI would lose its security contract with the mill if [it] did not follow [IFP's] recommendation." *Id.* ¶ 34, 917 A.2d at 408.

In light of *Currie*, Dr. Landsberg argues that it is a question of fact whether CompHealth's decision to impose the administrative hold was motivated by its fear of losing MCMH's business, and that it would be reasonable for a jury to conclude it was. The Defendants attempt to distinguish *Currie* by contending there is no evidence here that either C.N.M. Moise or MCMH ever recommended that CompHealth impose the first administrative hold on Dr. Landsberg. They also argue that a similar lack of evidence renders unreasonable the inference that CompHealth imposed the hold out of fear that it would lose its contract with MCMH. *Defs.' Resp.* at 5. They maintain that CompHealth imposed the hold "on its own initiative, out of an abundance of caution and as a routine matter of policy," and cite the fact that subsequent to the imposition of the hold, CompHealth and MCMH continued to do business together. *Id.* at 6.

The Court agrees that the record evidence in this case is thinner than the evidence of intimidation in *Currie*. However, because the Court views this evidence as generating an issue of material fact with respect to intimidation of a different sort than that involved in *Currie*, the Court concludes Defendants have failed in their burden as movants for summary judgment.[5]

Again, it is important to emphasize that the Court must assume at this stage that C.N.M. Moise's claim of sexual harassment was false. Further, the question is whether Dr. Landsberg

---

[5] The Court does not imply that an inference of *Currie*-type intimidation is unreasonable. On the contrary, the same facts that support the type of intimidation described here also support the inference that CompHealth imposed the first administrative hold to placate MCMH and ensure future contractual relations. The Court does not agree with Defendants, however, that proof of interference by intimidation requires that CompHealth knew C.N.M. Moise refused to continue working with Dr. Landsberg. *See Defs.' Resp.* at 5-6. The Court has found no support in the cases for requiring reliance in an intimidation context, and, in any event, the Court concludes that CompHealth was sufficiently intimidated when it learned the reasons for MCMH's decision to terminate Dr. Landsberg, whether it relied on them or not.

has generated a triable issue, not whether a jury will decide the issue in his favor. Dr. Landsberg's contention based on the record evidence and permissible inferences runs as follows: MCMH relayed to CompHealth a claim that a male physician had sexually harassed a female colleague and had acted inappropriately with other hospital employees. Significantly, the doctor's specialty is OB/GYN, a medical specialty that deals exclusively with women and requires daily intimate physical contact with them in order to perform routine examinations. In this context, the Moise accusation against Dr. Landsberg was a manifestly consequential concern and MCMH reinforced its seriousness by canceling the doctor's assignment.

In these circumstances, CompHealth had no real choice but to take contractual action against the accused physician to prevent him from continuing to practice his specialty. Dr. Landsberg was not going to practice medicine at MCMH; MCMH had cancelled his assignment. However, CompHealth could not continue to market Dr. Landsberg to other hospitals or medical practices, since to do so would place its clients in serious legal jeopardy. Further, the allegation against Dr. Landsberg necessarily tested CompHealth's ongoing contractual relationship with MCMH. It was, after all, CompHealth that had placed Dr. Landsberg with MCMH and within a few weeks of his assignment, the physician that CompHealth had supplied had been the subject of a most serious accusation of professional misconduct.

The Law Court has observed that "[i]n the context of a tort claim, a person acts 'intentionally' if he subjectively wants or subjectively foresees that harm to another will almost certainly result from his actions." *Curtis v. Porter*, 2001 ME 158, ¶ 12, 784 A.2d 18, 23 (citing *Me. Mut. Fire Ins. Co. v. Gervais*, 1998 ME 197, ¶ 11, 715 A.2d 938, 941). It would be reasonable for a jury to infer that MCMH, including C.N.M. Moise, knew how serious her allegations were and foresaw that CompHealth would be unable to market Dr. Landsberg's

services until the allegations were put to rest. Based on this alone, Dr. Landsberg has generated a genuine issue of material fact as to whether MCMH intimidated CompHealth into taking contractual action against him. Further, pursuant to *Grover v. Minette-Mills*, because it is reasonable to infer that C.N.M. Moise's employment relationship with MCMH "aided" and "'made possible'" her interference with CompHealth's contractual obligations, MCMH may be held vicariously liable for her conduct, provided it was tortious. 638 A.2d 712, 717 (quoting *McLain v. Training & Dev. Corp.*, 572 A.2d 494, 497-98 (Me. 1990)). Once the falsity of the allegation is assumed, MCMH's adoption of the false allegation and CompHealth's contractual response entitles Dr. Landsberg to bring this claim forward to a jury.

### C. Fraud

To prove tortious interference by fraud, Maine law requires the plaintiff to demonstrate that "the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff." *Grover*, 638 A.2d at 716. Again, at this stage, the Court assumes that C.N.M. Moise knowingly made false representations of material facts to MCMH employees for the purpose of inducing their reliance. The record reflects that MCMH decision-makers Mr. Jones and Mr. Fadley took actions based on her representations and relayed those false allegations, imbedded in true statements, to CompHealth, which acted on them to the damage of Dr. Landsberg. From the Court's perspective, the facts fairly pose a question of causation that should be put to the jury.

The Law Court's discussion of causation in the context of a tortious interference claim in *Petit v. Key Bank of Maine* is instructive. In *Petit*, the plaintiff and others borrowed in 1979 a significant sum from Depositors Trust Company of Southern Maine (a predecessor of defendant Key Bank) and Pepperell Trust Company, the lead lender, for the purpose of constructing an

amusement park. 688 A.2d 427, 429 (Me. 1996). Wallace Haselton was the chief executive officer of Depositors Corporation, also a predecessor of defendant Key Bank, and the corporate parent of Depositors Trust. *Id.* Robert Mitchell was the president of Pepperell Trust. *Id.* Seeking to refinance the 1979 loan, Petit approached the same group of lenders in the fall of 1981. *Id.* During this timeframe, the Maine Attorney General was investigating possible violations of state and federal law by Depositors Trust and Depositors Corporation. *Id.* The summary judgment record showed that in early December 1981, Mr. Haselton told an agent of the Attorney General that Petit, the plaintiff, had alleged that Mr. Mitchell of Pepperell Trust had accepted an illegal kickback in connection with the 1979 loan transaction. *Id.* Mr. Haselton knew the statement was false. *Id.* The following month, on January 8, 1982, at a meeting to discuss Petit's refinancing proposal, Mr. Mitchell refused to speak with her, and later informed her by letter that her proposal was denied and that absent a current account in March, foreclosure was imminent. *Id.* A personal friend of Mr. Mitchell filed an affidavit stating that Mr. Mitchell had indicated, as early as December 1981, he knew that Petit had accused him of accepting a kickback. *Id.*

Petit sued Key Bank for wrongful interference with her existing and prospective advantageous economic relationship with Pepperell Trust. *Id.* The trial court entered summary judgment in favor of Key Bank, determining as a matter of law that Petit could not "prove a causal connection between the tortious interference alleged and termination of the economic relationship alleged." *Id.* at 430. The Law Court reversed without lengthy discussion, observing simply that it was for the jury to decide "whether the false statement of Haselton caused the termination of the advantageous economic relationships alleged by Petit." *Id.*

Given there was no evidence in *Petit* that Mr. Haselton communicated the false representation directly to Mr. Mitchell, it cannot be correct to say, in this case, that Dr. Landsberg's claim fails because C.N.M. Moise never communicated directly with CompHealth. Similarly, given there was no evidence in *Petit* that the agent of the Attorney General (the sole intermediary of record) relied on the false representation as true, or repeated it with knowledge that it was false, it cannot be correct to say in this case that the intermediary recipients of C.N.M. Moise's allegedly false representations must have relied on them as true, or repeated them with knowledge of their falsity.[6] *Petit* stands for the proposition that if all elements of interference by fraud are met, it matters not that the tortfeasor makes the knowingly false representation to an intermediary, who then communicates the representation to another, who then relies on it as true and acts upon it to the plaintiff's damage. The ultimate question for the fact-finder is whether the tortfeasor caused the harm.

In this case, Dr. Landsberg has generated a genuine issue as to whether CompHealth relied on C.N.M. Moise's allegations as true. The inference that CompHealth relied on these allegations in making its decision to impose the first administrative hold is consistent with its release of the hold upon learning that MCMH had been unable to determine anything definitive, and that it was an irresolvable "he said she said" incident. In light of other facts demonstrating (1) that C.N.M. Moise harbored some opposition to Dr. Landsberg's prolonged stay at MCMH before the incident, *Pl.'s SAMF* ¶¶ 2-5; *Defs.' Reply SMF* ¶¶ 2-5; (2) the extent to which she publicized the incident and speculated as to its causes, *see generally Defs.' SMF*; and, (3) her

---

[6] The tortious interference case of *Springer v. Seaman*, 658 F. Supp. 1502, 1508-09 (D. Me. 1987), is readily distinguishable. In *Springer*, Judge Carter dealt with a situation where summary judgment for defendants was appropriate because the party that directly caused the plaintiff's damages had taken the adverse action based on its own investigation, not in reliance on defendants' false representations. 658 F. Supp. at 1509-10. Here, there is no indication that CompHealth performed an investigation; instead, it imposed the administrative hold in response to MCMH's statements and actions.

superficial knowledge of Dr. Landsberg's contract with CompHealth, *Defs.' Reply SMF* ¶ 26, the Court concludes that summary judgment on Count II is inappropriate, and that Dr. Landsberg may present his claim of tortious interference by fraud or intimidation to the jury.

## VI. CONCLUSION

The Court ADOPTS IN PART and REJECTS IN PART the Magistrate Judge's Recommended Decision on Motion for Summary Judgment (Docket # 54). The Court affirms without objection the Recommended Decision as regards Count I, the defamation count, and GRANTS the Defendants' Motion for Partial Summary Judgment on Count I only to the extent that Plaintiff is limited to proving at trial as a basis for liability only those potentially defamatory statements he alleged in the Complaint. The Court otherwise DENIES Defendants' Motion for Partial Summary Judgment as to Count I (Docket # 28). The Court REJECTS the Recommended Decision as regards Count II, the tortious interference count, and DENIES Defendants' Motion for Partial Summary Judgment as to Count II (Docket # 28).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 5th day of August, 2009